EPPS *v.* STATE OF INDIANA.

[No. 30,102. Filed September 23, 1963. Rehearing denied November 22, 1963.]

516

*James R. Martin, Cook, Bayliffe, Mahoney & Martin* and *Curtis W. Roll,* all of Kokomo, for appellant.

*Edwin K. Steers,* Attorney General, *Carl E. Van Dorn and David S. Wedding,* Deputy Attorneys General, for appellee.

MYERS, C. J.—This is an appeal from a conviction of murder in the first degree. Appellant was indicted by the Grand Jury of Howard County, Indiana, for murder while in the perpetration of a robbery, which is declared to be first-degree murder according to the

statutes of Indiana (§10-3401, Burns' Ind. Stat., 1956 Replacement). He was tried before the Howard Circuit Court by a jury, found guilty and sentenced to life imprisonment. A motion for new trial was filed, which was overruled. This appeal followed.

The assignment of errors alleges error in that the court overruled the motion for new trial, overruled the motion to be discharged for lack of prosecution, and admitted over objection certain evidence at the hearing on the motion to discharge.

The Argument section of appellant's brief is divided into seven specifications which incorporate statements of error set forth in the motion for new trial and in the assignment of errors.

Specification I claims that the court erred in overruling the appellant's motion to discharge for lack of prosecution and in allowing certain evidence to be admitted over objection in the hearing on this motion. The facts relating to this are as follows: Appellant was placed under arrest on November 6, 1959, which was the 47th judicial day of the September Term of Court, 1959. The terms of the Howard Circuit Court commence on the second Mondays of January, April and September, to continue as long as necessary (§4-332, Burns' Ind. Stat., 1946 Replacement). Appellant was confined in the Howard County Jail during the remainder of the September Term, 1959, the January Term, 1960, and through the April Term, 1960, until the September Term, 1960, when he was tried on October 17, 1960, and sentenced on November 16, 1960. He claims this to be in violation of his constitutional and statutory rights.

Art. 1, Sec. 12, of the Constitution of Indiana provides that a person charged with a crime has the right to be

tried "speedily, and without delay." This section has been implemented by statute which says, in part, as follows:

"And no defendant shall be detained in jail, without a trial, on an indictment or affidavit, for a continuous period embracing more than two [2] terms after his arrest and commitment thereon; or if he was in jail at the time the indictment was found or affidavit filed, more than two [2] terms after the term at which the indictment was found or the affidavit first filed; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such terms: . . . ." §9-1402, Burns' Ind. Stat., 1956 Replacement.

On September 13, 1960, appellant filed his motion for discharge, alleging that from the date of appellant's arrest, indictment, and up to the filing of the motion for discharge, more than two full terms of the Howard Circuit Court had elapsed, and that no delay was caused by appellant in preventing the cause from being tried, either by motion for continuance or otherwise. An affidavit in reply by the State together with an answer in reply to this affidavit by appellant put the matter at issue. It was set for hearing on October 7, 1960.

From the evidence heard therein, the record reveals that appellant was arrested on November 6, 1959; that on January 6, 1960, which was the 98th judicial day of the September Term, 1959 (and the next to the last day of the term), the Grand Jury filed its felony-murder indictment against appellant; that on January 13, 1960, the court appointed counsel to represent appellant as his attorney; that shortly thereafter, before the end of January, 1960, the Prosecutor had a conversation with appellant's counsel, in the court room,

before the regular Judge, about setting a date for the trial of this cause, and counsel stated he was planning to take an extended vacation in Florida for at least two months and did not want to set the case quickly; that it was agreed to wait until appellant's counsel returned before setting it for trial; that after his return, the Prosecutor and appellant's counsel met in the court room of the Howard Circuit Court on April 25th, where there was a conference held before the regular Judge concerning the setting of this case for trial. There was testimony that at this meeting appellant's counsel and the Prosecutor stood before the Judge and checked their calendar dates from little diary books which each had. Several dates were mentioned and were found objectionable. Appellant's counsel insisted that it would take two weeks to try this case because of it being a first-degree murder case and that it would take at least a week to select a jury. The regular Judge went through his calendar and said it could not be tried accordingly until the fall term of court. The Prosecutor stated that the Judge suggested October 17, 1960, and "that was fine" with him. The Judge then asked appellant's counsel if it was all right with him, but counsel said nothing. At a later date, in discussing the matter, appellant's counsel referred to the fact that the case was set for trial on October 17th. Previous to this meeting, appellant's counsel had requested the court to give him assistance in the defense of the case. Mr. James R. Martin was appointed assistant counsel on April 5, 1960.

Appellant alleges error in that the court overruled objections to the testimony of various witnesses which brought out these facts. These witnesses consisted of a newspaper reporter, the court reporter, the court bailiff and the prosecuting attorney. The objections, in general,

were that this evidence was irrelevant and immaterial because the setting of a trial date in a criminal case is a judicial act to be undertaken by the court; that the vacations of counsel would have no bearing on the court performing its judicial duty. It is his contention that there is an absolute duty upon the State, because of the Constitution and the implementary statute, to set these criminal cases for trial before the two-term period has expired, and that it is not the obligation of a defendant in a criminal case to insist on this as a prerequisite. *Zehrlaut* v. *State* (1951), 230 Ind. 175, 102 N. E. 2d 203, is cited as authority, in which it was stated by this court that it is the right of an accused to remain silent while under recognizance, and it is the duty of trial courts and prosecuting attorneys to see that a defendant is brought to trial, within the appropriate sections of the Indiana Constitution and §9-1403, Burns' Ind. Stat., 1942 Replacement. (This section is similar to §9-1402, Burns' Ind. Stat., 1956 Replacement, in that it refers to persons held by recognizance rather than to persons held in jail.)

Appellee contends that the delay was caused by appellant's acts and so the ruling of the trial court was justified. It is admitted that appellant filed no motions for continuance after his arrest and indictment. At the hearing on the motion for discharge, appellant filed exhibits tending to show that during the January and April Terms, 1960, of court there were numerous dates "consumed by the court in doing nothing." The old adage that hindsight is better than foresight applies to trial courts in so far as their business is concerned. A trial court judge may have a full calendar for the next six months at one particular date, and yet find that, at a later date, trials, hearings and arguments evaporate, disappear and are taken off

the calendar and leave the court with time on its hands. The regular Judge in this case projected his calendar on April 25, 1960, to October 17, 1960. Appellant's counsel wanted two continuous weeks for the trial of this cause. According to the Judge's calendar *at that time*, there would not be two weeks for a trial until October 17, 1960. What happened to the Howard Circuit Court's calendar after April 25, 1960, cannot be controlling. The evidence submitted by the Clerk as to how many days the court was actually trying cases and hearing other matters up until October 17, 1960, cannot be material due to the settlement, postponement and dismissal of cases which could have taken place after January 6, 1960. Thus, the allegation by appellant that there was sufficient time to try the case must fail.

As to appellant's contention that the delay was not caused by his act, we must look at his counsel's actions following his appointment as such. First, he requested of the Prosecutor that nothing be done until he returned from an extended Florida vacation; then he requested additional counsel to help him. At the April 25th meeting in court, he knew the purpose of the meeting was to select a trial date. Apparently several dates did not meet with his approval, as was the case also with the Prosecutor. Counsel said it would take two weeks to try the case. The Judge asked him if October 17, 1960, would be satisfactory. The record shows that appellant's counsel did not answer, and the Prosecutor admits this, but later counsel referred to the case as having been set for October 17, 1960. The regular Judge apparently thought the date was agreed upon between the parties when he made an order book entry on October 6, 1960, setting the cause for trial on October 17th, because he refers to the previous agreement

made between the Prosecutor and appellant's attorneys during the April Term, 1960.

These actions on the part of appellant's counsel indicate a delay in the trial. In the hearing on a motion to discharge such as this, it is the defendant's burden to show that the delay complained of was caused by the State "and not by him, and that it was not had upon his request *or upon his agreement.*" (Our emphasis.) *Sullivan* v. *State; Flick* v. *State* (1939), 215 Ind. 343, 345, 346, 19 N. E. 2d 739; *Colglazier* v. *State* (1953), 231 Ind. 571, 110 N. E. 2d 2. An agreement to set a trial date in a criminal case beyond the two-term limit has the effect of delaying the case so as to bring it within the statutory exception. Appellant denies there was an agreement, saying his counsel stood mute and said nothing when asked about the trial date. He claims he was under no obligation to do anything, pursuant to the holding in the *Zehrlaut* case, *supra.* However, in this case there was a conflict between the court's entry as to the agreement and the appellant's contention. The burden was on the appellant to show there was no agreement, and the court, in resolving the conflict, did not feel that he had sustained that burden. Therefore, as of April 25, 1960, the delay in trial was caused by actions of appellant's counsel, and the court committed no error in overruling the motion to discharge.

A defendant speaks through his attorney and, certainly, at the hearing on a motion to discharge, the State has the right to introduce evidence to show that defendant's attorney made statements or took action which had the effect of requesting a delay in trial in order to counteract defendant's charges. The court committed no error in overruling objections to this testimony.

The appellant further claims error in that the court made an order book entry on October 6, 1960, setting the case for trial on October 17, 1960. This entry reads as follows:

"The Court now assigns this cause for trial by jury for 9:30 A.M., October 17, 1960 as was previously agreed to by the Prosecuting Attorney and attorneys representing the defendant during the April Term 1960 of this Court."

Appellant takes the view that this is really a *nunc pro tunc* entry dating back to April 25, 1960, and that to justify such an entry there must exist some written memorandum or memorial in the records of the court contemporaneous with or preceding the date of the alleged action. *O'Malia* v. *State* (1934), 207 Ind. 308, 192 N. E. 435. We can find no such memorandum or memorial in this record. However, we do not understand this entry to be a *nunc pro tunc* entry. It is an entry as of the date of October 6, 1960, setting the cause for trial and reciting that it was pursuant to an alleged agreement made in the April Term of court. It does not show that this order was intended to appear at any other date from that of October 6, 1960. A court speaks through its order book entries, and such records import verity. *Platis* v. *Gary State Bank* (1938), 105 Ind. App. 690, 17 N. E. 2d 486. The court did not commit error in refusing to strike that part of the order as it pertained to the agreement allegedly made between the parties.

Specification II in appellant's Argument is that the verdict is not sustained by sufficient evidence. Specification III is that the verdict is contrary to law. Appellant argues the specifications together. It is his contention that the evidence hardly tends to establish a suspicion of guilt, and, that being so, it

is not sufficient to sustain a conviction. Appellant cites as authority *Johnson* v. *State* (1957), 236 Ind. 509, 141 N. E. 2d 444; *Baker* v. *State* (1956), 236 Ind. 55, 138 N. E. 2d 641; *Robertson* v. *State* (1952), 231 Ind. 368, 108 N. E. 2d 711; and *Steffler* v. *State* (1952), 230 Ind. 557, 104 N. E. 2d 729. If the entire record does not show how any prudent man could find the defendant to be guilty beyond a reasonable doubt, the issue becomes one of law for the Supreme Court to decide. *Lee* v. *State* (1954), 233 Ind. 176, 118 N. E. 2d 115; *Baker* v. *State, supra.* Appellant says he does not ask this court to weigh the evidence, but to determine that there was not sufficient evidence of probative value from which a reasonable inference of the guilt of the accused could be drawn, and cites as authority *Mack* v. *State* (1957), 236 Ind. 468, 139 N. E. 2d 434, and *Todd* v. *State* (1951), 230 Ind. 85, 101 N. E. 2d 922.

The evidence most favorable to the State is as follows: On November 6, 1959, there was a Package Liquor Store located at 313 East Monroe Street in Kokomo, Indiana. It was owned and operated by a person known as Con J. Carey and bore the name of "Con Carey's Liquor Store." On the afternoon of that day, Carey was waiting on customers until about 6:30 p.m., when he was replaced by a clerk named Albert Long, who was to work during the supper hour. Appellant was employed at a garage and lived within a block of the Liquor Store. Around 5:00 o'clock p.m. on that day, he went into the store and purchased a bottle of wine from Con Carey. Some time after 7:00 o'clock p.m., Carey returned to his store and found police officers there and the body of Albert Long, dead, behind the counter. There was blood on the counter, floor and wall near the door. Albert Long had died

from multiple gunshot wounds. Carey stated that about $400 was missing from the cash register. The coin tray was on the counter. Some silver and paper money were scattered on the floor. On the counter, by the cash register, in a paper sack, was a bottle of the same type of wine purchased earlier by appellant. The sale on the cash register showed ninety-five cents. The State charges that between 6:30 and 7:00 o'clock p.m., on November 6, 1959, appellant returned to the Liquor Store, robbed it, and shot and killed Albert Long in so doing.

The State's witness in chief was a man named Lorenzo Wiley. He testified that he had a paycheck which he decided to cash at the Liquor Store. He arrived there at about 7:00 o'clock p.m. and opened the door. He saw appellant standing behind the counter emptying the cash register on to the counter. Appellant looked up, saw Wiley, picked up a gun from the counter and, "in a whispering tone," told him to go back outside. Wiley backed out, closed the door and started to walk away to the east. Then he heard a shot and some one "hollered." Wiley turned and looked through a large plate-glass window in the store. It was stated that a person standing outside would have a clear view back to the counter. Wiley heard another shot and saw fire spitting from a gun. He also saw a man's feet "kicking up from behind the counter." The man's shoes, ankles and lower part of his legs could be seen. His head could not be seen, but his feet "were kind of rotating." Wiley saw two shots from the gun and heard possibly another one. Then he saw appellant come out of the door and run across the street. Wiley did not say where he went. He was scared and excited and, seeing a friend, told him what had happened. They went to a nearby Gasoline Service Station, but Wiley was too

frightened to call the police. He then ran to his landlady's house where he telephoned the police. Next, he went to a place known as the Keystone Club, where he had his meals, and told the manager what he had seen. The manager called the police. Wiley was acquainted with appellant, having known him when appellant was a member of the United States Air Force.

About 7:15 o'clock p.m., the body of Albert Long was found behind the counter at the store. He had been shot in the body and legs at four different places. Firemen unsuccessfully tried to resuscitate him, but he was pronounced dead from massive hemorrhage and shock as a result of the gunshots. Bullets found at the scene were in the general classification of a .32 caliber metal base bullet.

Police quickly went to appellant's home, where his wife and children were living. They were told he had left around 6:30 o'clock p.m. to go to a Legion Post of which he was a member. This Legion Post was about three blocks away from his home. The police went to the Legion Post at 8:25 or 8:30 p.m., found appellant and placed him under arrest, taking him to the police station. He was under the influence of intoxicating beverages when arrested, but did not seem unusually disturbed. He denied all charges of being in the store at the time Long was shot, and claimed he had gone directly to the Legion Post from his home. Police officers thoroughly searched his home that evening, but did not find a gun or any money. Appellant had only a few dollars on him when apprehended and carried no gun. He admitted to having owned a .32-20 Smith & Wesson revolver (erroneously called a "Smith & Weston" revolver in the record), but said he had taken it out of pawn that day and sold it to an Air Force private from nearby Bunker Hill Air Base for

$24. He did not know the private's last name, but called him "Jack." His story was to the effect that he had gone by the Liquor Store after work, about 5:00 o'clock p.m., and purchased a fifth of wine. Thereafter he went to his home, drank the wine, watched television with his children until around 6:30 o'clock, when he put on his raincoat and went over to the Legion Post to "mess around" with the boys. He claimed he arrived there between 6:30 and 7:00 o'clock p.m. and talked with a few of his friends at that time who were standing around the bar or playing cards upstairs.

The Air Force private known as "Jack" was never identified as being stationed at the Air Base, nor was his automobile, which appellant described, recognized as being on the Base, although there were investigations and lineups at which appellant was present.

There was conflicting evidence as to the time when appellant arrived at the Legion Post. A bartender and dry cleaner said he was there between 6:30 and 7:00 o'clock p.m., but it is to be noted that neither of them looked at a clock or a watch so as to fix the time. An employee of the Legion Post said appellant came in about 7:00 o'clock or a little after. The Vice-Commander of the Post testified that he was there that evening and left to take his children to a basketball game about 6:50 p.m. He did not remember seeing appellant.

The money which was claimed to have been stolen was never found. The gun, a .32-20 Smith & Wesson revolver, was discovered six months later by a fifteen-year-old boy, half buried in some trash under a tree, at a location approximately one and three-tenths miles from the Liquor Store. It took a police officer about half an hour to walk from the Liquor Store to this point and back to the Legion building. The gun was cleaned

and tested at the Indiana State Police Post in Marion County by an expert on firearms identification. He compared the bullets found at the Liquor Store, one of which was taken from the deceased clerk's body, with those fired at the testing laboratory. The result indicated that the bullets which killed the deceased were fired from the same weapon.

The operator of the pawnshop stated that the numbers on the gun matched those on a pawn ticket or bill of sale for a .32-20 Smith & Wesson pistol which he had given to some one with appellant's name on September 25, 1959. Appellant admitted that he had taken this pistol out of pawn on November 6, 1959.

It was not disputed that the State's chief witness, Lorenzo Wiley, had a police record and was characterized by the manager of his club as having a bad reputation for truth and veracity as well as for peace and quietude in the community.

Appellant took the stand in his own defense and attempted to prove his alibi. He stated that on November 8, 1960, while he was in jail, he had permitted a physician to place him under hypnosis for the purpose of clarifying his memory as to the events which took place the evening of November 6, 1959. However, the results were negative. Later he refused to take a lie detector test at Indiana University when driven to Bloomington, Indiana, for that purpose. He said this was upon his counsel's advice. Appellant admitted to owning the pistol, to have gotten it out of pawn on November 6, 1959, and to have test-fired it that afternoon in the basement of the garage where he worked.

There was a statement by the Chief of Police that on November 6th, after appellant was taken into custody, appellant made the statement to him: "Why don't you

shoot me?" The Chief responded: "What do I want to shoot you for?" Appellant said: "They're going to kill me anyhow for what I did tonight." He would not answer as to what he had done. Another police officer testified that during the questioning of appellant that evening, he said: "I ought to be shot for what I done." The officer said: "What do you mean?" The answer was: "You know what I mean."

The general rule is that only when the evidence is without conflict, and leads to but one reasonable conclusion, and the verdict of the jury reached a contrary conclusion, the verdict will be disturbed as being contrary to law. *Bowens* v. *State* (1953), 231 Ind. 559, 563, 109 N. E. 2d 91.

When considering the sufficiency of the evidence, we must take into consideration only that evidence most favorable to the State, together with all reasonable and logical inferences that may be drawn therefrom. *Myles* v. *State* (1955), 234 Ind. 129, 124 N. E. 2d 205.

Much of appellant's argument deals with the credibility of witnesses, particularly as to Lorenzo Wiley. As a rule, this court will not determine the credibility of various witnesses when the question of the sufficiency of the evidence is raised on appeal. *Denson* v. *State* (1960), 240 Ind. 324, 163 N. E. 2d 749. Appellant argues that this conviction rests upon the testimony alone of an admitted criminal and an irresponsible person, and that it should be carefully scrutinized to determine whether there is any substantial evidence to sustain each issuable fact. He cites as authority *Sylvester* v. *State* (1933), 205 Ind. 628, 187 N. E. 669; *Sullivan* v. *State* (1928), 200 Ind. 43, 161 N. E. 265; and *Eaton* v. *State* (1917), 186 Ind. 167, 115 N. E. 329. However, we find that there were

other witnesses and other circumstantial evidence presented in this case from which the jury may have drawn reasonable inferences which tended to corroborate Lorenzo Wiley's statements. It is not within the power of this court to say which testimony the jury should have believed. *Bange* v. *State* (1958), 237 Ind. 422, 146 N. E. 2d 811. Of course, this court cannot weigh conflicting evidence. *Myers* v. *State* (1960), 240 Ind. 641, 168 N. E. 2d 220.

We find there was sufficient evidence upon which the jury could have based its verdict of guilty. There was enough conflict in the evidence that there could not be but one reasonable conclusion of appellant's innocence, so the verdict is not contrary to law.

In Specification IV, it is contended that the court committed error in allowing appellant's wife to answer certain questions on cross-examination as to the facts and circumstances pertaining to a pending divorce action between appellant and his wife. In particular, reference is made to a statement by his wife that appellant was "running around" with a white girl. Appellant, being a colored citizen, argues that this could have created prejudice against him in the minds of the jurors. This court is asked to take notice that many people of the Caucasian race become highly prejudiced against citizens of the Negro race when anything is mentioned directly or indirectly concerning the mixture of the races. Attention is called to the fact that Howard County, Indiana, was formerly the headquarters of the Ku Klux Klan. This objection was based upon a rule that unless the accused puts in evidence traits of character by the introduction of evidence as to his general reputation in that respect, it is not competent for the State to prove the accused's reputation in regard to

the commission of acts involving moral conduct. *Stitz* v. *State* (1885), 104 Ind. 359, 4 N. E. 145; *Griffith* v. *State* (1895), 140 Ind 163, 39 N. E. 440; *Stewart* v. *State* (1916), 184 Ind. 367, 111 N. E. 307. It is argued that appellant did not put his moral character in issue, and so it was error to allow his wife's testimony as to the divorce action.

Appellant's wife testified on direct examination that her husband came home for lunch; that he came home after work; that he played with his children while at home; that on the evening of the murder he played with his five-month-old daughter; that he gave money to his son to go out and buy food; that while in jail he advised his wife how to treat their sick baby. This evidence could lead to the conclusion that appellant was a good family man, husband and father. Since this had been opened on direct examination, the State could properly inquire more fully as to appellant's true regard for his wife and children. *Hicks* v. *State* (1938), 213 Ind. 277, 11 N. E. 2d 171, 12 N. E. 2d 501. We are of the opinion that the wife's evidence put into issue appellant's character as a family man, and thus it was not error to allow the cross-examination.

In this case there was no evidence of prejudice shown, nor that the Ku Klux Klan exerted any influence. As a court of law, this court takes no judicial notice or cognizance of prejudice in reference to race, color or creed. The reference by appellant to the influence of the Ku Klux Klan is not to be considered. The sorry chapter in the history of this state which concerned this organization, the sole purpose of which was to promote racial and religious prejudice, hatred and intolerance, is a thing of the past.

In Specification V, it is argued that the court committed error in pronouncing judgment on appellant over his objections, because it lacked jurisdiction for the reasons that (1) two terms of court had passed, and (2), appellant had informed the court of his intention to file a motion for new trial and had the constitutional right to be present in person during the filing of his motion, the preparation thereof, the hearings, arguments and ruling thereon, and that he had the right to be present and consult with his attorneys or to file and present the motion in person.

Objection number one has been considered in this opinion. As to number two, appellant relies on *Ex Parte Huffman* (1914), 181 Ind. 241, 244, 104 N. E. 511, 512, which states, in part, as follows:

> "While judgment may be pronounced before the determination of a motion for a new trial (Calvert v. State [1883], 91 Ind. 473), the law does not contemplate that one convicted and sentenced shall be committed to the State prison until after his motion for a new trial shall have been determined, unless the filing of such motion has been waived. The statute grants a convicted defendant thirty days within which to file his motion for a new trial. This motion may be filed and presented by the defendant in person. Section 13, of our Bill of Rights (Constitution, Art. 1, §13), guarantees the accused the right 'to be heard by himself,' and this right continues until the disposition of a motion for a new trial, where such a proceeding is provided for. The trial court would not be warranted in ordering the sheriff to take the petitioner to the State prison, pending the determination of his motion for a new trial."

The *Huffman* case has been supplemented and modified by *Joseph, Pierce* v. *State* (1957), 236 Ind. 529, 541, 141 N. E. 2d 109, 114, 115, in which it is said:

"A motion for a new trial may be presented, argued and ruled upon in the absence of the accused, if he is represented by counsel and is awarded all the substantial rights which the law accords him."

The court committed no error in pronouncing judgment.

In Specification VI, it is urged that the trial court erred in that it separated the witnesses, but allowed one police officer to remain in the court room and then permitted him to testify. There is no objection to this by appellant shown in the record. Furthermore, it is admitted that the matter is entirely within the discretion of the trial court. *Coolman* v. *State* (1904), 163 Ind. 503, 72 N. E. 568. See, also, *Romary* v. *State* (1945), 223 Ind. 667, 64 N. E. 2d 22. Appellant only conjectures as to the impression this might have made on the jury. No abuse of discretion having been shown, there was no error in permitting the officer to testify.

In Specification VII, appellant says there was error when the court allowed in evidence the pawn ticket or bill of sale concerning the pawning of the gun. It is claimed that there was no foundation laid to show that it was made in some regular course of business by a person whose duty it was to make it. Thus, it is contended that this evidence could not have been introduced under the Shop Book Entry Rule.

The operator of the pawnshop testified that he personally filled out the bill of sale when the gun in question was pawned on September 25, 1959. He gave one copy to the customer and kept the other for the shop. He said this was the customary way of doing business and was the only record kept of the transaction. He could not identify appellant as the customer who pawned the gun. We think this

brings the transaction within the Shop Book Entry Rule. *State ex rel.* v. *Central States Bridge Co.* (1912), 49 Ind. App. 544, 97 N. E. 803; *Woodsmall* v. *Carr Tire Co.* (1934), 98 Ind. App. 446, 185 N. E. 163. However, there is little merit to this contention, as no prejudice is shown to appellant. He had consistently admitted that the pistol was in pawn; that it belonged to him, and that he repossessed it on November 6, 1959. No question was ever raised as to whether or not he pawned it on September 25, 1959. The court did not err in admitting this evidence.

Judgment affirmed.

Achor, Arterburn and Landis, JJ., concur; Jackson J., dissents without opinion.

NOTE.—Reported in 192 N. E. 2d 459.