Joe C. ANDREWS, Jr., Appellant,

v.

STATE of Indiana, Appellee.

No. 481S107.

Supreme Court of Indiana.

Nov. 3, 1982.

Clorius L. Lay, Lay & Marshall, P.C., Gary, for appellant.

Linley E. Pearson, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant, Joe C. Andrews, Jr., was convicted of Murder, Ind.Code § 35–42–1–1 (Burns Repl. 1979), at the conclusion of a jury trial in Lake Superior Court on November 26, 1980. Defendant was sentenced to fifty (50) years imprisonment. He now appeals.

Defendant Andrews raises four errors on appeal, concerning: 1) whether the trial court erred when it denied Defendant's Motion to Suppress; 2) whether the trial court committed error when it denied Defendant's Motion for Discharge pursuant to Ind. R.Crim.P. 4(C); 3) whether the trial court committed error when it admitted into evidence, over objection, the videotape of oral statements made by Defendant; and, 4) whether there was sufficient evidence to sustain Defendant's conviction for murder.

A Portage policeman investigated a pick-up truck, with its emergency flashers on, parked near a grocery store about 3:00 a.m. on March 8, 1978. Defendant and Robert Lawson were the only people in the truck.

Asked to produce his driver's license, defendant Andrews fumbled in his wallet but could not produce any identification. The officer backed his car behind the truck and noticed the defendant throwing pieces of paper out of the window. These pieces of paper were three cashier's checks made out to Charles Clowers or Alberta Clowers, Alberta S. Clowers, and Alberta Coulson. Later it was determined that the checks, worth more than $12,000, were taken from the residence of Charles Coulson, who was found murdered in his home.

## I

■ Defendant Andrews claims that the trial court erred when it failed to grant his Motion to Suppress. Defendant points to three specific errors in this one issue: that there was no probable cause for his arrest by Officer Green; that he should have been allowed to speak with his parents, not his grandmother, before giving a statement to the police; and that the location of the murder weapon was elicited from him in violation of his *Miranda* rights.

Police officer Green testified at the hearing on the Motion to Suppress. At 3:00 a.m., Officer Green was traveling east on U.S. 20 in Portage, Indiana. Green observed a red pickup truck leave a trailer park, pull onto U.S. 20, leave the highway and park next to a Zip Food Store and turn its emergency flashers on. Officer Green stated that he went to investigate because he observed two traffic violations: improper lane usage and failure to signal. Green talked with the two youths in the truck and one youth, Robert Lawson, asked him where the nearest restaurant was located. Green told him, then asked where Lawson lived. When Lawson stated that he lived in the trailer park, Ted's East Town, Green became suspicious because the restaurant he mentioned was only two blocks away and Green thought it was strange that Lawson did not know where the restaurant was. Green asked for some identification, but when the defendant was unable to produce any, Green backed his patrol car near the truck and began a check on the license

plates. At that time he observed the defendant throwing pieces of paper out of the window. These "pieces" of paper were cashier's checks, totaling over $12,000. Green then ordered the youths out of the truck, patted them down, and advised them of their rights. Defendant claims that there was no probable cause for the investigation and arrest.

A recent case, *Taylor v. State,* (1980) Ind., 406 N.E.2d 247, involved a situation similar to the one here. A police officer observed a car make two U-turns, pull off on a side street, turn off the lights, and then move to a different location. Noticing that there was an isolated 7–11 Store nearby, the police officer became suspicious and pulled the car over. In *Taylor* we stated:

"We note that a police officer may describe a situation as being one of investigation or suspicion, or he may state that he did or did not believe that he had probable cause. However, this subjective evaluation is not determinative of the issue. The test for probable cause was set out in *Brinegar v. United States,* (1949) 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879, 1890, quoting *Carroll v. United States,* (1924) 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, as follows:

Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are], sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested.]

The initial stop of this car was lawful. The officer who stopped the vehicle had observed traffic violations committed in his presence and also had observed behavior that, in his experience, was suspicious conduct. The officer was discharging a legitimate investigative function when he decided to approach the occupants of the car. The governmental interest in effective crime prevention and detection underlies the recognition that a police officer may, in appropriate circumstances

and in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. *Terry v. Ohio,* (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889."

There was probable cause for Officer Green to arrest the Defendant. Officer Green stated at the suppression hearing that Ted's East Town, the trailer park which Defendant had just left, had been the scene of recent burglaries. When Defendant committed two traffic violations, Green decided to stop and see if anything was wrong. Under questioning by defense counsel, Green stated he stopped to investigate because of the recent burglaries and the traffic violations. When Defendant failed to produce identification, Green made a license plate check and then noticed Defendant throwing the cashier's checks out of the window. As Officer Green said, "Normally, people do not throw such items away." Suspicious that the youths were involved in some crime, Green ordered them out of the truck and arrested them. As in *Taylor,* Green was justified in stopping and making an investigation. The ensuing events confirmed his suspicion that wrongdoing was at hand, and he acted properly in making the arrests.

When the defendant was being booked at the police station, the officers discovered that he was sixteen years old. Officer Miller informed Defendant that he had the right to confer with a parent or guardian before the police could begin questioning him. Defendant told Miller he wanted to speak with his grandmother and that he definitely did not want to speak with his father or mother. Complying with Defendant's request, the police contacted his grandmother and Defendant was taken to juvenile court where his grandmother joined him. Defendant was furnished a lawyer at the juvenile detention hearing and the court was advised that the police intended to interrogate Defendant.

After the juvenile detention hearing, Defendant and his grandmother, Leora Wilson, were taken to the Crown Point Police Department. Defendant's mother, Dorothy Andrews, was also at the Crown Point Police Department but Defendant refused to see her or speak with her. Mrs. Andrews testified that she and her husband adopted Defendant in May of 1975; Leora Wilson was Defendant's natural grandmother. Defendant and Mrs. Wilson were advised of his constitutional rights, both signed the waiver form, and Defendant then gave a statement to the police. Now Defendant claims that his statement cannot be used against him because he was not allowed to confer first with his parents.

*Lewis v. State,* (1972) 259 Ind. 431, 288 N.E.2d 138, is the leading case in this State concerning a voluntary statement given by a juvenile defendant. In *Lewis* this Court stated:

"We hold therefore that a juvenile's statement or confession cannot be used against him at a subsequent trial or hearing unless both he and his parents or guardian were informed of his rights to an attorney, and to remain silent. Furthermore, the child must be given an opportunity to consult with his parents, guardian or an attorney representing the juvenile as to whether or not he wishes to waive those rights. After such consultation the child may waive his rights if he so chooses provided of course that there are no elements of coercion, force or inducement present."

*Id.* at 439, 288 N.E.2d at 142.

The holding in *Lewis* was twofold. First, we recognized that the juvenile should be afforded the special status in the criminal procedure that he enjoyed in other areas of the law. Second, we required that the juvenile be afforded a *meaningful* opportunity to consult with his parents or guardian without any coercion on the part of the police, before a statement may be taken. *Shepard v. State,* (1980) Ind., 404 N.E.2d 1, 5; *Burnett v. State,* (1978) 268 Ind. 618, 622, 377 N.E.2d 1340, 1342; *Buchanan v. State,* (1978) 268 Ind. 503, 506, 376 N.E.2d 1131, 1134. We have also held that it is not necessary that the parent or guardian be present at the giving of the confession or

statement, *Shepard, supra,* and that a sister may be a guardian since she acted *in loco parentis. Burnett, supra; Hall v. State,* (1976) 264 Ind. 448, 450, 346 N.E.2d 584, 586.

■ The record revealed that Defendant was adopted in May of 1975 but ran away from the Andrews' home in February of 1976. The Andrews did not see Defendant again until he was arrested in March of 1978. Mrs. Andrews said she knew Defendant was at his natural grandmother's home during the two years he was gone but was told by Defendant's probation officer not to do anything about it. Mrs. Andrews also said that during the year Defendant lived in her home he ran away three times. Her testimony indicated that Defendant was secretive and basically the relationship between Defendant and his adoptive parents was strained. Mrs. Wilson, Defendant's grandmother, told one of the officers that Defendant had been living with her off and on through most of his life. The same officer stated that Defendant requested his grandmother because he lived with her most of the time and considered her to be his guardian.

We find no error in allowing Defendant's grandmother to confer with him before Defendant executed the waiver of rights and gave a statement. The main concern of *Lewis* and its progeny is to afford the juvenile defendant a stabilizing and relaxed atmosphere in which to make a serious decision that could possibly affect the rest of his life. The primary focus should be on the defendant's rights, not that of the parents. The record indicates that Defendant trusted his grandmother more than his parents. A trusting atmosphere, rather than an atmosphere riddled with animosity, would be more conducive to a meaningful consultation between a juvenile and an adult. The situation presented here is similar to the situation found in *Hall, supra.* There, the defendant's father was alive but the defendant lived with his sister and had not seen his father for several years. Although the sister was not a court-appointed guardian, we felt the sister was a "de facto guardian" who established her status by

acting *in loco parentis.* The same is true of the role played by Mrs. Wilson. Since the overriding atmosphere of the interrogation indicates fundamental fairness and a valid waiver of constitutional rights was executed by Defendant and his grandmother, we find no error in the admission into evidence of his statement.

Finally, Defendant argues that the murder weapon should not have been introduced into evidence. After Defendant told the police he wanted his grandmother contacted, he was seated in a conference room with Officer Miller. Officer Miller made the following statements under questioning by defense counsel at the hearing on the Motion to Suppress:

"Q. Exactly, as best as you remember, what did you say about a gun?

A. I told him [Defendant] that the gun had been thrown out and I hoped— in the vicinity of the school and I hoped no little kid found it and I hoped that nobody would get hurt.

Q. And what did Mr. Andrews say?

A. He said, 'Don't worry about it,' he said, 'I'll show you where the gun is at.' "

Defendant later directed the police to the area where the murder weapon was found. Upon appeal, Defendant argues that the location of the murder weapon was elicited in violation of his rights guaranteed by *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and therefore the gun should not have been introduced into evidence.

■ We note that when the gun was offered for introduction into evidence, defense counsel objected on chain of custody grounds. Grounds for objection to the admission of evidence asserted on appeal may not differ from those asserted at trial. *Proctor v. State,* (1979) Ind., 397 N.E.2d 980; *Smith v. State,* (1979) Ind., 397 N.E.2d 959. Error in overruling a motion to suppress evidence is not preserved for appellate review unless there is a proper objection when evidence is later offered in trial. *Grimm v. State,* (1978) 268 Ind. 145, 374 N.E.2d 501. This issue has been waived on review.

■ In addition, while we agree that the location of the murder weapon was illegally obtained in light of the United States Supreme Court's rationale in *Rhode Island v. Innis,* (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (*Miranda* safeguards come into play whenever a person in custody is subjected either to express questioning or to its functional equivalent), we do not agree that the admission of the murder weapon constitutes reversible error. This weapon was not the only hard piece of evidence against the defendant. Defendant gave a lengthy statement to the police detailing the events of the murder. He told about picking up the gun, lying in wait for the victim, and then shooting the victim in the neck. This statement was properly admitted into evidence. The explicit nature of the confession reduces any possible harm caused by the introduction of the murder weapon. We find no reversible error on this question.

## II

■ Defendant contends that he should have been discharged pursuant to Ind.R. Crim.P. 4(C) because he was held for more than one year before being brought to trial. Defendant filed his Motion for Discharge on November 14, 1980, but the motion was denied at a hearing on November 17, 1980, the first day of trial.

Criminal Rule 4(C) reads as follows:

"*Defendant discharged.* No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as under subdivision (A) of this rule. Any defendant so held shall, on motion, be discharged."

On March 8, 1978, Defendant was arrested. On June 16, 1978, the charge of murder was filed against him. Under Rule 4(C), the one-year period would run from the later date. Therefore, Defendant should have been tried for murder no later than June 16, 1979. Because of delays attributable to both Defendant and the trial court, nine trial dates were set and canceled before trial finally began on November 17, 1980. Defendant's Motion for Discharge was filed on November 14, 1980, so the crucial time period runs from June 16, 1978, to November 14, 1980, a total of eight hundred and eighty-two (882) days.

When there are delays attributable to the defendant, the time limitations in Criminal Rule 4 are to be extended by the period of such delays. *Bradberry v. State,* (1977) 266 Ind. 530, 364 N.E.2d 1183; Ind.R.Crim.P. 4(F). Upon Defendant's motion, the trial court continued his arraignment from June 29, 1978 to July 3, 1978. This delay of four days is chargeable to Defendant. *Little v. State,* (1981) Ind., 415 N.E.2d 44. On July 5, 1978, Defendant filed a Special Plea of Insanity and Motion for Insufficient Comprehension. The competency hearing was held on January 3, 1979; therefore, the delay of one hundred and eighty-two (182) days was chargeable to Defendant. *Twomey v. State,* (1971) 256 Ind. 128, 267 N.E.2d 176. On December 10, 1979, the trial court rescheduled the trial for April 28, 1980, because defense counsel was unavailable for trial. This delay of one hundred and forty days was chargeable to Defendant because the acts of the attorney are the acts of the defendant. *Epps v. State,* (1963) 244 Ind. 515, 192 N.E.2d 459. The trial was delayed an additional fifty-three days, from May 29, 1980 to July 21, 1980, while new counsel was obtained for Defendant. This delay was also chargeable to Defendant. *State ex rel. Sheppard v. Circuit Court of Clark County,* (1980) Ind., 413 N.E.2d 258. The total amount of delay caused by Defendant was three hundred and seventy-nine days.

The trial court was required to reset the trial date three times due to the congestion of the court calendar: June 12, 1979, to

August 27, 1979 (seventy-six days); August 27, 1979, to December 10, 1979, (one hundred and five days); and September 15, 1980, to November 17, 1980, (sixty-three days). This rescheduling will also toll the running of the time period under Ind.R. Crim.P. 4(C). Therefore, the total amount of delay caused by the trial court congestion was two hundred and forty-four days.

The total amount of delay caused by both Defendant and the trial court was six hundred and twenty-three days. Subtracting that amount from eight hundred and eighty-two days, the elapsed time from the date the murder charge was filed to the date that the motion for discharge was filed, leaves two hundred and sixty-two days. This is well under the one-year limitation of Rule 4(C). Defendant's Motion for Discharge was properly denied by the trial court.

### III

■ Defendant next contends that the trial court committed an error of law and abuse of its discretion when it admitted into evidence a videotape of his statements to the police. Defendant alleges that because the tape was of such poor quality, the jury would speculate about what was contained on the unintelligible portion of the videotape.

The State contends that this issue has been waived because the videotaped statement was not included in the record. However, under Ind.R.App.P. 7.2(C), "[i]ncompleteness or inadequacy of the record shall not constitute a ground for dismissal of the appeal or preclude review on the merits." *Ward v. State,* (1982) Ind., 439 N.E.2d 156; *McNeal v. State,* (1982) Ind.App., 434 N.E.2d 127. We ordered the videotape sent to this Court on September 30, 1982. The trial judge certified that the videotape had been in the sole possession and control of the court reporter since its admission into evidence.

After reviewing the videotape, we do not agree with Defendant's contention that the recording was of such poor quality that it should not have been admitted because of

the requisites of *Lamar v. State,* (1972) 258 Ind. 504, 282 N.E.2d 795. The police officers who did the interrogation identified themselves and also identified Defendant and his grandmother. The officers repeated, and had Defendant verify to this, that his constitutional rights under *Miranda* had been read to him. Defendant told about the murder in a clear voice and in a coherent manner. Halfway through the statement, the screen became "snowy" and at times one could not make out the figures of Defendant and his grandmother. These instances lasted for only short periods. Although the picture had interference, the sound recording was strong and clear, and the voice of the defendant was identifiable as was that of the interrogator. The videotaped statement was very similar to Defendant's written statement which recounted the details of the murder. Nothing shown indicates that the videotape was edited as Defendant now claims, nor would the jury speculate at any point of the videotape. There was no error in admitting the videotape into evidence.

### IV

■ Finally, Defendant claims that there was insufficient evidence introduced at trial to prove that he had the specific intent to commit murder. Specifically, he points to the testimony of examining physicians who stated that he suffered from schizophrenia.

As we stated recently in *Roell v. State,* (1982) Ind., 438 N.E.2d 298, 300:

"Whether or not the appellant had the requisite mental state to commit murder was within the province of the fact-finding authority of the jury and it was for them to interpret it, assess its weight, and give it such credibility as they found in arriving at their verdict. *Oricks v. State,* (1978) 268 Ind. 680, 377 N.E.2d 1376; *Shackelford v. State,* (1976) 264 Ind. 698, 349 N.E.2d 150."

Ind.Code § 35–41–2–2 (Burns Repl.1979), the statute defining culpability, reads as follows:

"(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. (b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."

At trial, Dr. Hogle and Dr. Gallenkamp testified about Defendant's mental state. Dr. Hogle said that after interviewing Defendant and viewing the videotaped statement, it was his opinion that Defendant was sane. Hogle said that Defendant gave a clear, coherent story on the tape and his calm, rational manner convinced Hogle of his sanity. Dr. Gallenkamp on the other hand stated that he believed Defendant was suffering from schizophrenia. However, Gallenkamp also stated that on the night of the murder, Defendant could have either known or not known what he was doing when he shot Coulson. Defendant points to the testimony of both doctors to show that his mental state was in question. We will not set aside the jury verdict because of the presence of such evidence, but only upon the absence of substantial evidence of probative value upon one or more of the essential elements of the offense for which Defendant was tried. *Oricks, supra.* Having reviewed the record, we feel that the jury was correct in finding Defendant guilty of murder. Defendant's written and video-taped statements recounted how he planned to wait until the victim arrived home and then Defendant was going to pay him back for some dirty tricks Coulson, the victim, played on him. Defendant called Bob Lawson who instructed him to grab a butcher knife and slit Coulson's neck after Coulson went to sleep. In the meantime, Defendant found a gun and intended to use that to kill Coulson. When Coulson returned to his residence, Lawson told Defendant not to hang up because he wanted to hear the shots. Defendant said that after Coulson said hello, there was one shot fired and Coulson fell to the floor and moaned for a short time. It is well-settled that the necessary intent to commit murder may be inferred from the intentional use of a deadly weapon in a manner likely to cause death. *Jackson v. State,* (1981) Ind., 426 N.E.2d 685; *Zickefoose v. State,* (1979) Ind., 388 N.E.2d 507. After shooting the victim, Defendant removed his wallet and keys, and then stole the victim's truck. The arresting officers testified that Defendant appeared normal and calm, he was coherent, and his behavior was not unusual as it would be if he was high or intoxicated as Defendant claimed to be. There was sufficient evidence for the jury to find the defendant had the specific intent to commit murder.

The judgment of the trial court is affirmed.

GIVAN, C.J., and HUNTER and PRENTICE, JJ., concur.

DeBRULER, J., concurs in result.