**Donald C. PITTMAN, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 71S00–8711–CR–1090.

Supreme Court of Indiana.

Sept. 14, 1988.

Aladean M. DeRose, South Bend, for appellant.

Linley E. Pearson, Atty. Gen., Jay Rodia, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Donald C. Pittman was charged and convicted following a jury trial in the St. Joseph Superior Court of Robbery, a class A felony, Burglary, class B felony, and murder. On March 30, 1987, he was sentenced by the trial court to forty (40) years for felony murder and ten (10) years for burglary, said sentences to be served concurrently. The robbery charge was held by the court to have merged into the felony murder.

Six issues are presented for our review in this direct appeal, as follows:

1. sufficient evidence of causation of death to convict Pittman of felony murder;

2. error in final instruction;

3. refusal of the trial court to appoint a hypnotist to assist Pittman;

4. denial of Pittman's motion for mistrial;

5. ineffective assistance of counsel; and

6. sufficiency of the evidence to convict Pittman of robbery and burglary.

The victim, Robert LaBere, was alone in his home at 902 Ohio Street, Walkerton, Indiana, on the evening of February 14, 1986. He lived alone in a duplex and the other unit was unoccupied. LaBere weighed between 400–500 pounds. Because of his obesity and other complications, he had circulatory problems. His hobby was coin collecting. He would buy rolls of pennies, look through them and then rewrap them in standard coin wrappers. At about 10:00 p.m. on February 14, LaBere entered the Walkerton Police Station and reported his home had been broken into and he had been stabbed. He was able to drive himself to the station and report the incident. He described his assailant as a tall white male about forty (40) wearing a red baseball type cap, blue jeans, and a jacket. He said his assailant had a face he would never forget. He had been stabbed three times on parts of his chest and abdomen. Some bleeding was observed, and fat tissue was protruding from a stomach wound. He told medical attendants he chased his assailant throughout the house during which time he was stabbed. LaBere stated he was able to grab the red baseball cap from his attacker.

LaBere was then taken by ambulance to the LaPorte Hospital for further treatment. He was able to walk with assistance and was alert and conscious. The stab wound to his abdomen which penetrated the stomach lining, the peritoneum, was about an inch in length at the surface and about three fingers length at the fascia. Because the wound penetrated the fat layer and because LaBere had low blood pressure and presented some symptoms of shock, Dr. Moore decided to do an exploratory laparotomy to determine whether any vital organs had been damaged. Dr. Moore and his associates felt it was vital to determine whether organs had been damaged while at the same time recognizing the laparotomy was a high risk procedure to LaBere due to his obesity and circulatory problems. The laparotomy revealed the knife wound had not damaged any of LaBere's vital organs but did reveal serious conditions of the heart. After the laparotomy, LaBere's condition improved from critical to fair; he had stable blood pressure and was able to assist the nurses in getting himself out of bed to a couch. He was conscious and alert.

On March 1, 1986, LaBere died. The immediate cause of death was diagnosed as a pulmonary saddle embolism, a blood clot which blocked both lungs, originating probably in LaBere's legs. The blood clot did not originate from the site of the wound. Prior to February, 1986, LaBere was known by his treating physician to have recurring cellulitis and lymphangitis, i.e., swelling of the legs and susceptibility to infection. At the time of autopsy his right lower leg showed stasis dermatitis, a condition which he had prior to admission and which generally indicates long term bad blood flow in the legs and extremities and susceptibility to embolism. Apparently the pulmonary embolism was partly a product of Mr. LaBere's obesity and his post-operative immobility. It was further indicated that had LaBere not undergone laparotomy to determine injury to vital organs he probably would have survived, according to his treating physician, because cleansing and suturing of the surface wound was a minor procedure.

Further evidence developed that Pittman had been with friends Jesse Roach, George Mosley, and Teddy Salzer, in Walkerton. They had been drinking heavily during the evening. During the evening they separated and later came back together at Salzer's apartment, where Mosley, and Tim Nice were visiting. At that time, Pittman looked scared or excited, had a foul odor about him, and stated he had robbed a fellow and stabbed him three times. He had three rolls of pennies in his possession. He washed his clothes and put them back on wet. He had in his possession a butterfly hunting knife which he left at Salzer's home. Nice had told them the fellow he robbed vomited on him which accounted for the foul smell. Pittman's wife confirmed that he smelled like vomit when he returned to their home about 10:30 p.m., and did not have his red baseball cap with an Indian on it which he had worn when he left. Pittman had told Salzer and the others that the man he stabbed lived in the 900 block and that he regretted stabbing a man for three rolls of pennies. LaBere's house had been ransacked and the glass had been knocked from the front storm door. A foul odor prevailed throughout the house and the red baseball cap with blood on it was found on the kitchen floor.

I

■ Pittman claims the cause of LaBere's death was a pulmonary saddle embolism, probably originating in his legs and ultimately blocking his lungs. His reasoning follows that the causal link between that embolism and the one-inch, non-organ threatening knife wound in LaBere's abdomen two weeks earlier is too remote to support a felony murder conviction. There is no question LaBere's physical condition put him at much higher risk than one without the physical disabilities to withstand the trauma of the injuries inflicted by Pittman. It is not a valid defense, however, that it was just as likely LaBere might have died in his own living room from an embolism even without the stab wounds. It has never been a defense that the victim would not have died from the wounds in-

flicted on him had it not been for his weakened physical condition  The question is whether the stab wounds inflicted by Pittman caused or contributed to LaBere's death or set in motion a series of events that could reasonably be expected and did, in fact, result in his death.  The surgeon in charge of giving emergency treatment to LaBere at the LaPorte Hospital, together with LaBere's treating physician, found the knife wound to the abdomen had penetrated the peritoneum.  There were two other knife wounds on LaBere's body.  A serious threat to LaBere's life was that one or more vital organs might be damaged.  Obviously if there was such damage and it was not repaired, LaBere faced a life threatening situation.  The doctors determined that an exploratory laparotomy was essential even though this procedure presented some risk.  This emergency was brought about by the injuries inflicted on LaBere by Pittman and set in motion the chain of events that resulted in LaBere's death.

A similar situation was presented in *Sims v. State* (1984), Ind., 466 N.E.2d 24. Sims had entered the home of Edwin Rose, a 92 year-old man who lived alone.  Sims took items from Rose's home and beat Rose with a brick, causing injuries among which was an open fracture on his mandible.  Because of the fracture to his mandible, Rose was unable to eat solid foods and doctors found it necessary to surgically repair the fractured mandible.  Rose's condition improved for a short time and then deteriorated, resulting in his death from congestive heart failure and lobar pneumonia.  Physicians testified the beating he received, including the fractured mandible, contributed to the series of events that resulted in his death.  Writing for a unanimous court, Justice DeBruler found:

> Appellant contends that the surgery on the fractured mandible was unnecessary and worsened the victim's condition; and as a result, the intervening cause of surgery relieves him of criminal responsibility for the victim's death.  This argument must fail.  It was determined at trial that the victim was in stable condition before the surgery and that the surgery

was necessary in order to prevent a possible life threatening infection.  In order for an intervening cause to break the chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold the appellant responsible for the actual result.  Here, the intervening cause of surgery was not extraordinary because the injury necessitated it.  As a result it is fair to hold the appellant responsible for the victim's death.

> There is sufficient evidence from which the jury could infer that the beating inflicted upon the victim contributed mediately or immediately to his death.

*Sims*, 466 N.E.2d at 26.

Physicians in the instant case testified in a similar manner to those in *Sims*.  Dr. Rick Hoover, a pathologist, believed that LaBere's death was attributable to acute cardiac failure from breakage of blood clots which formed due to prolonged bed rest which resulted from the exploratory laparotomy or the surgery on the abdomen for repair of the stab wounds.  Dr. Hoover further indicated that "[i]f it were not for the stab wound of the abdomen there would be no cause of death because in my opinion Robert LaBere would be alive today."  There was sufficient evidence from which the jury could infer the stab wounds Pittman inflicted on the victim contributed mediately or immediately to his death.  *See Myers v. State* (1987), Ind., 510 N.E.2d 1360, 1368; *Brown v. State* (1986), Ind., 498 N.E.2d 1192, 1195; *Sims*, 466 N.E.2d at 25–26; *Stephenson v. State* (1932), 205 Ind. 141, 191–192, 179 N.E. 633, 650, *petition dismissed*, 205 Ind. 141, 186 N.E. 293.

## II

Pittman claims the trial court erred by giving final instruction No. 8:

> In other words, if you find that Donald Pittman stabbed Robert LaBere, then you may find him responsible for the death of Robert LaBere unless you find there was an extraordinary variation or intervening factor between the result Donald Pittman intended or risked by stabbing Robert LaBere and the final result—Robert LaBere's death.

Defense did not object to the giving of instruction No. 8 nor did it tender an instruction in substitution. Therefore the defense has waived the issue for this direct appeal. *Clarkson v. State* (1985), Ind., 486 N.E.2d 501, 506; *Minneman v. State* (1982), Ind., 441 N.E.2d 673, 679, *cert. denied* 461 U.S. 933, 103 S.Ct. 2099, 77 L.Ed. 2d 307. Furthermore, the instruction was a proper statement of the law. *See Sims,* 466 N.E.2d at 25.

### III

■ Pittman contends the trial court committed an abuse of discretion by denying his request for appointment of a hypnotist at public expense to aid in the reconstruction of his memory of the events on the night of the crime. He claims his memory loss was due to intoxication.

Pittman primarily contends the trial court erred in following Indiana law which provides testimony of a witness who has been hypnotized is unreliable and inadmissible. The trial judge indicated that if the hypnotism should revive memories in Pittman that then induced him to plead guilty, she would have a problem in accepting that plea based on unreliable evidence. Pittman claims this consideration by the trial court in making her decision contravened *Rock v. Arkansas* (1987), 483 U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37. In *Rock,* defendant shot her husband during an altercation. She admitted having the gun while she fought with her husband but did not remember directly how she came to fire it. She then was hypnotized and recalled, through hypnotism, that she did not have her hand on the trigger of the gun, her arm holding the gun bumped against her husband's arm and the gun discharged without her pulling the trigger. Following this revelation, a ballistics expert examined the gun and it was his finding from tests that a defect in the trigger mechanism of the gun would cause it to fire when it was bumped or dropped on the floor without pulling the trigger. Defendant's testimony regarding her recall from hypnotism was refused by the trial court. In a five-to-four decision, the United States Supreme Court held that despite the unreliability that hypnosis may

introduce into testimony, the procedure has been credited as instrumental in obtaining particular types of information. Further, hypnotically refreshed testimony is subject to verification by corroborating evidence and other traditional means of assessing accuracy and inaccuracies can be reduced by procedural safeguards such as the use of tape or video recording. The Court found Arkansas's *per se* rule excluding all hypnotically refreshed testimony infringes impermissibly on a criminal defendant's right to testify on his or her own behalf. *Rock,* 107 S.Ct. at 2711–2715.

The situation presented here does not parallel that of *Rock v. Arkansas.* Ms. Rock was attempting to testify in her own behalf regarding memory restored by hypnosis that was corroborated by expert testimony. Pittman's request was for the appointment of a hypnotist, at public expense, to determine whether there was a memory loss and, more importantly, whether he could remember anything that would aid in his defense. Such an evaluation would be subject to speculation since Pittman presented insanity and intoxication defenses. Furthermore, Pittman claimed he could not remember many of the events of the evening of February 14. However, Dr. Berkson, a psychiatrist who had examined Pittman, determined that Pittman was not suffering from mental disease or defect at the time of LaBere's murder. Berkson's opinion was that Pittman's memory loss was self-serving since he had shown no previous history of memory loss problems and Pittman's memory appeared to be intact on the two occasions Berkson had interviewed him. Also, other witnesses testified Pittman freely discussed the events of the evening, admitted he had stabbed this victim and received three rolls of coins, and recounted many other details which were corroborated. Pittman's claim that hypnotism might revive memory that would show the stabbing was the result of an accident or self-defense is not convincing, given the facts in this case. *See Hinkle v. State* (1984), Ind., 471 N.E.2d 1088, 1089.

■ Finally, an accused is not constitutionally entitled at public expense to any

type of expert he desires to support his case. This matter is commended to the sound discretion of the trial court, whose determination will not be overturned absent a showing of abuse of discretion. *Myers*, 510 N.E.2d at 1363; *Thomas v. State* (1984), Ind., 459 N.E.2d 373, 376. Pittman has failed to demonstrate in what way the court's denial of his request for appointment of a hypnotist resulted in tangible prejudice to his right to present an adequate defense or his right to testify. He has not sufficiently demonstrated abuse of discretion of the trial court on this issue.

### IV

At the time State's witness Salzer had been excused from the witness stand and walked past the jury box, he began talking. Pittman moved for mistrial because there had been an improper communication between a witness and the jurors. The trial court interviewed Salzer and one of the jurors as follows:

THE COURT: Did you speak as you left the witness stand, sir?

MR. SALZER: When I was walking this way I started to talk to myself. I just looked up and smiled. And just as I was talking to myself. I wasn't really—

THE COURT: What were you saying to yourself, sir?

MR. SALZER: What was I saying to myself?

THE COURT: Yes, sir.

MR. SALZER: That—I said—I think I said, "Well, it's about time for lunch" or something like that. "It's time for lunch" is what I said. I was just talking to myself. I didn't know—I don't know nobody here.

THE COURT: Thank you, sir. When the return we'll question the jurors, if that is your desire, Mr. Rubin.

MR. RUBIN: Thank you, Your Honor.

THE COURT: Oh, bring them in. I thought they were gone.

(Whereupon, the jury was escorted into the courtroom in the charge of the bailiff).

THE COURT: Do any of you recall who was sitting in the fourth or fifth chair from where Mrs. Oldham is now? Assuming she's one, and Mr. Zwerneman is three, Miss Gaines if [sic] four, and then there is an empty chair at five.

MS. JAICOMO: This is where I was sitting before.

THE COURT: I thought it might have been you, Mrs. Jaicomo. Mrs. Jaicomo, when Mr. Salzer stepped down from the witness chair and walked out, do you recall his having said anything to you or near you?

MRS. JAICOMO: Yes. He said, "See you"—no. He said, "Thank you." That's all he said. Something "you".

THE COURT: All right. Thank you.

Motion for mistrial is denied. Remedy of a mistrial is within the discretion of the trial court and we review the ruling of the trial court to determine whether or not there was an abuse of discretion. *Patterson v. State* (1986), Ind., 495 N.E.2d 714, 719–720. The possibility a witness may have improperly communicated with a juror while in the courtroom requires a determination of whether a substantial likelihood of prejudice existed such as requires the trial court to make further inquiry into the matter. *Bruce v. State* (1978), 268 Ind. 180, 226, 375 N.E.2d 1042, 1067, *cert. denied* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662. Here the trial court made such inquiry. In view of the response from witness Salzer and the juror, there is no demonstration of a substantial likelihood of prejudice that could have affected the jury and we find no abuse of discretion.

### V

Pittman contends he was denied his right to effective assistance of counsel by the deficient performance of trial counsel in three respects: 1) trial counsel's failure to object to the submission of State's instruction No. 8 to the jury, 2) counsel's failure to prevent pathologist Hoover's report from being disclosed, and 3) his failure to request that the jury be admonished after the incident with witness Salzer. The standard for evaluation of effective assistance of counsel requires a showing that counsel

was not functioning as the counsel guaranteed by the Sixth Amendment. Second, defendant must show the deficient performance prejudiced his defense. Unless a defendant makes both showings it cannot be said the conviction resulted from a breakdown in the adversary process that renders the result unreliable. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh. denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864. Since we have already found that instruction No. 8 was a proper statement of the law, counsel's failure to object to it does not present an issue that comports with *Strickland.* The same can be said of Pittman's allegation that counsel failed to request an admonishment to the jury at the time his motion for mistrial regarding improper communication between witness Salzer and a juror. Our holding in Issue IV above disposes of this allegation.

■ Pittman urges that the manner in which his attorney handled the court's appointment of Dr. Rick Hoover, a pathologist, to assist the parties evaluation of the issue of the decedent's cause of death, amounted to deficient performance. Pittman's counsel filed a motion for the appointment of a forensic pathologist, alleging that counsel was unable to interpret the medical data due to his lack of expertise. The motion requested that an independent pathologist be appointed, that is, independent of physicians directly involved with the victim in this incident and suggested two. The court did not take either of the pathologists suggested by Pittman but ordered that Dr. Rick Hoover be appointed as an independent medical expert to review the matter. Pittman's claim of ineffectiveness of his counsel was based on the fact that counsel did not use Dr. Hoover as a confidential consultant for the development of the causation issue and as an assistant in the review and critical analysis of the medical materials and medical witnesses and/or as a referral source for medical journal and treatise material. He claims counsel merely sent Dr. Hoover the autopsy report, hospital records, and other medical materials relating to Robert LaBere's death. Dr. Hoover then undertook to act as the court's expert rather than Mr. Pittman's private consultant. He issued an opinion so favorable to the State's position that the State called him as its own witness.

Pittman does not demonstrate ineffectiveness of counsel. It cannot be presumed that Dr. Hoover's expert opinion would be changed by a confidential relationship between Pittman's counsel rather than furnishing the material to the court as an expert assistant to the court and all parties. Apparently, Pittman's concern is that Dr. Hoover's findings and conclusions could have been kept from the jury if his counsel controlled knowledge of those findings and conclusions. Actually, Dr. Hoover's opinion regarding the factors which coalesced in the victim's death did not differ in any significant aspect from the opinions of the two physicians, Dr. Moore and Dr. Heckman–Davis, who were responsible for the course of treatment for LaBere after his admission to the hospital. Dr. Hoover's testimony was cumulative of the testimony of these two expert witnesses. Neither the trial court nor defense counsel handled this incident improperly. Pittman had a disinterested expert witness appointed in the proper manner and that witness's testimony was agreeable to all the other expert medical testimony. This result does not indicate ineffective assistance of counsel.

## VI

■ Finally, Pittman contends the evidence does not support his convictions of robbery and burglary beyond a reasonable doubt. In support of this contention Pittman points out weaknesses in some of the evidence, claiming that "[b]ecause for each and every fact which tends to tie Donald Pittman to the LaBere home on February 14, 1986, there is an undisputed contradictory or subverting fact which cannot be overlooked in the analysis of proof beyond a reasonable doubt." He then points out the red hat found in LaBere's home was never positively identified as Pittman's, that there was no blood on Pittman's person even though LaBere was covered with

blood, no fingerprints of Pittman were found in the LaBere home, no footprints were found at the scene despite snow on the ground, Pittman's butterfly knife was never positively identified as the one that caused LaBere's wounds and that when LaBere described his assailant as having a face he would never forget, he did not allude to a beard, which Donald Pittman had at the time. This contention does nothing more than point out there was a conflict in the evidence. Conflicts are to be resolved by the jury and not this court. Recitation of facts already set out in this opinion indicate there was ample evidence before the jury from which they could infer or find beyond a reasonable doubt that Pittman did, in fact, commit the crimes of burglary and robbery.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.