**Michael BRADY, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 71A03–8809–CR–266.

Court of Appeals of Indiana, Third District.

June 21, 1989.

Anthony V. Luber, South Bend, for appellant.

Linley E. Pearson, Atty. Gen., Richard C. Webster, Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

Michael Brady was convicted by a jury in the St. Joseph Superior Court of Child Molesting, a class C felony.[1] He was sentenced to seven years in prison and fined $1,000.00.[2] Brady presents 28 issues for appellate consideration, which we restate as:

I.  Whether the statute authorizing and the procedures used to videotape a child witness' testimony violated Brady's right to confront his accusers?

II.  Whether the trial court erred in allowing a child witness to use dolls to illustrate her testimony?

III.  Whether the trial court erroneously denied Brady's motion for mistrial tendered during opening statements?

IV.  Whether the trial court erroneously allowed hearsay statements to be admitted?

V.  Whether the trial court erroneously allowed the State to cross-examine Brady on specific bad acts.

VI.  Whether the trial court abused its discretion by allowing opinion evidence on the subject of injuries to the victim?

VII.  Whether the trial court abused its discretion by allowing Abbie Dallek to testify as an expert on the subject of "child abuse accommodation syndrome"?

VIII.  Whether the trial court erroneously restricted cross-examination of a State witness for bias?

IX.  Whether the trial court erred by refusing to instruct the jury on the proper use of circumstantial evidence?

X.  Whether the evidence is sufficient to support Brady's conviction?

XI.  Whether the sentence imposed by the trial court was manifestly unreasonable?

Affirmed.

The marriage of Carla Myers and Michael Brady was dissolved in 1983. Carla received custody of their daughter, T.B. (b. June 22, 1982), subject to Brady's visitation rights. Carla married Mark Myers after her divorce from Brady, thereafter living with Myers, T.B., and her son from a previous unrelated marriage.

The evidence most favorable to the verdict discloses that on Friday night, April 4, 1986, Brady collected T.B. who was now three years of age for her first weekend visit pursuant to a revised visitation order. The next afternoon, Carla picked up T.B. for a short time in order that she might attend a family party. T.B. was bathed and returned to Brady after 7:00 p.m. the same evening. Carla noted nothing unusual about T.B. prior to taking her back to Brady that evening. As per the visitation order, Brady returned T.B. to Carla at approximately 6:00 p.m. on Sunday, April 6.

On the following morning, April 7, 1986, Mark Myers, Carla's present husband, received a telephone call from a teacher at T.B.'s school informing him that T.B. had been found hiding in the closet of the school's bathroom, crying that her "gina" hurt and refusing to allow the teacher to examine her. Myers immediately picked T.B. up from school and took her home. Carla's mother took T.B. to the bathroom where she observed a dry discharge on T.B.'s underwear and blood in the toilet. She informed Myers who immediately took T.B. to meet her mother at the office of Dr. Harriet Hanley, T.B.'s physician.

Dr. Hanley's attempts to examine T.B. were futile at first; T.B. had become hysterical and insistent that no one touch her. Following the administration of two sedatives, however, T.B.'s resistance lapsed. Upon examination, Dr. Hanley observed a

---

**1.** West's AIC 35–42–4–3(b).

**2.** West's AIC 35–50–2–6.

great amount of trauma to T.B.'s genital area: a large hematoma on the right labia majora; a laceration along the line between the labia majora and labia minora; and a laceration extending downward toward the anus which Dr. Hanley opined continued to the inside of the vagina. T.B.'s physical and emotional state at the time rendered an internal examination impossible.

Detective Sergeant Elaine Battles, of the St. Joseph County Police Department, was contacted by a Welfare Department child protective team case worker and informed of suspected sexual abuse regarding T.B. Battles conducted an interview with T.B. at the Myers' home on April 10, 1986, during which T.B. told her that her father had hurt her. T.B. demonstrated how her father had hurt her using "anatomically correct" dolls provided by Battles, placing one foot of the male doll between the legs of the female doll. T.B. also related that her father had put hot water and soap on one hand and rubbed it up and down between her legs. In a subsequent interview, Battles placed nude, "anatomically correct" male and female drawings before T.B. Battles then asked T.B. to show where Brady had hurt her, whereupon T.B. colored the genitalia of the female drawing. When asked to show or draw how Brady had hurt her, T.B. colored a hand on the male drawing.

During an interview in October of 1986, T.B. again demonstrated with "anatomically correct" dolls how "Daddy Mike" (Brady) had hurt her. After taking the clothes off the dolls, T.B. arranged them in the male foot to female genitalia position previously demonstrated to Battles. When asked how else "Daddy Mike" had hurt her, T.B. placed the male doll on top of the female doll in a position of intercourse. T.B. was asked whether she had felt any pain, to which she responded affirmatively.

## I.

### Videotaped Testimony

In the months preceding Brady's final trial date of May 26, 1987, several hearings were held in response to the State's petition to videotape T.B.'s testimony pursuant to West's AIC 35–37–4–8. Ultimately, the State's petition was granted and T.B.'s videotaped testimony admitted into evidence at trial over Brady's motion in limine and objections seeking its exclusion. Brady contends on appeal that the trial court erred in overruling his objection to the State's motion to videotape on the grounds that IC 35–37–4–8 is unconstitutional as a violation of his right to confront his accusers face-to-face. Brady also contends that the procedures used to videotape his testimony violated his right to confrontation and that the quality of the videotape was so poor as to render it inadmissible.

■ IC 35–37–4–8 sets forth conditions which must be met before allowing a child's testimony to be videotaped and guidelines which must be followed during the videotaping session. In pertinent part, IC 35–37–4–8 provides:

(a) This section applies to criminal actions for felonies under IC 35–42 and for neglect of a dependent (IC 35–46–1–4) and for attempts of those felonies (IC 35–41–5–1).

\* \* \* \* \* \*

(c) On the motion of the prosecuting attorney, the court may order that the testimony of a child be videotaped for use at trial.

(d) The court may not make an order under subsection (b) or (c) unless:

(1) The testimony to be taken is the testimony of a child who:

(A) is less than ten (10) years of age;

(B) is the alleged victim of an offense listed in subsection (a) for which the defendant is being tried or is a witness in a trial for an offense listed in subsection (a);

(C) is found by the court to be a child who should be permitted to testify outside the courtroom because:

(i) a psychiatrist has certified that the child's testifying in the courtroom would be a traumatic experience for the child;

(ii) a physician has certified that the child cannot be present in the courtroom for medical reasons; or

(iii) evidence has been introduced concerning the effect of the child's testifying in the courtroom, and the court finds that it is more likely than not that the child's testifying in the courtroom would be a traumatic experience for the child;

(2) the prosecuting attorney has informed the defendant and the defendant's attorney of the intention to have the child testify outside the courtroom; and

(3) the prosecuting attorney informed the defendant and the defendant's attorney under subdivision (2) within a time that will give the defendant a fair opportunity to prepare a response before the trial to the prosecuting attorney's motion to permit the child to testify outside the courtroom.

\* \* \* \* \* \*

(f) If the court makes an order under subsection (c), only the following persons may be in the same room as the child during the child's videotaped testimony:

\* \* \* \* \* \*

(3) The defendant's attorney (or the defendant, if the defendant is not represented by an attorney).

\* \* \* \* \* \*

(7) The defendant, who can observe and hear the testimony of the child without the child being able to observe or hear the defendant. However, if the defendant is not represented by an attorney, the defendant may question the child.

(g) If the court makes an order under subsection (b) or (c), only the following persons may question the child:

(1) The prosecuting attorney.

(2) The defendant's attorney (or the defendant, if the defendant is not represented by an attorney).

(3) The judge.

A statute is presumed constitutional until the party challenging it as unconstitutional makes a clear showing to the contrary. *Hopper v. State* (1986), Ind.App., 489 N.E. 2d 1209, 1212, *trans. denied.* When two interpretations of a statute are possible, the courts must adopt the interpretation which upholds the statute. *Eddy v. McGinnis* (1988), Ind., 523 N.E.2d 737, 738. We conclude that Brady's argument that IC 35–37–4–8 is facially invalid is without merit.

■ Our supreme court recently examined the constitutionality of West's AIC 35–37–4–6, a statute which allows child hearsay statements to be admitted into evidence upon meeting criteria very similar to those of IC 35–37–4–8(d), and determined that, provided a defendant has the opportunity to cross-examine the child witness at some point, his right to confront his accusers has not been violated. *See, Miller v. State* (1987), Ind., 517 N.E.2d 64. The *Miller* court stated that, although the Indiana Constitution specifically imbues criminal defendants with the right to face-to-face confrontations of their accusers, cross-examination is the primary right protected under Article 1, Section 13 of the Indiana Constitution. *Id.* at 68. The United States Supreme Court, however, recently addressed the question of whether an Iowa statute, which permitted child witnesses to testify from behind a screen, unconstitutionally violated a defendant's right to confront his accusers. The Supreme Court in *Coy v. Iowa* (1988), — U.S. —, 108 S.Ct. 2798, 101 L.Ed.2d 857, established that Amendment Six of the United States Constitution does indeed ensure defendants the right to confront their accusers face-to-face even without specific language to that effect and proceeded to declare the Iowa statute unconstitutional as a violation of that right. Brady urges that the *Coy* holding requires in all cases that a defendant must be given the opportunity to face his accusers. We disagree.

The specific infirmity of the Iowa statute struck down in *Coy* was its establishment of a blanket exception to the right of face-to-face confrontation for victims of sexual abuse by presuming trauma to those victims. No individualized findings of need for special protection were required. In regard to this, the Supreme Court stated, "... something more than the type of generalized finding underlying such a statute

is needed when the exception is not 'firmly ... rooted in our jurisprudence.'" *Id.*, 108 S.Ct. at 2803. The Supreme Court went on to acknowledge that the right to confront one's accusers face-to-face is not an absolute, and left open the subject of whether exceptions to that right exist. We conclude that IC 35–37–4–8 creates one such exception without violating Brady's right to confront his accusers.

■ As with any constitutional analysis, we are required to balance the right of the defendant to confront his accuser with the competing interest of the state in protecting child witnesses from the trauma of giving testimony before a court filled with strangers and the person whom they allege brought them to harm. We agree with Justice O'Connor's position that the protection of child witnesses in cases such as this is a state interest compelling enough to override a defendant's right to a face-to-face confrontation, provided the procedural safeguard of finding need on case-by-case basis is required and adhered to. *See* O'Connor, J., concurring opinion, *Coy, supra*, 108 S.Ct. at 2803. (White, J., joining in Justice O'Connor's concurring opinion.)

As with IC 35–37–4–6, the obvious purpose of the legislature in enacting IC 35–37–4–8 was to reduce trauma for child victims of sexual abuse while preserving the defendant's right to confrontation. However, the legislature did not commit the *Coy* mistake of creating a presumption of trauma to these victims. Rather, the legislature put in place a restriction requiring that need for the extraordinary measure of videotaping child witness testimony be determined on a case-by-case basis. IC 35–37–4–8(d)(1)(C). On the strength of the *Miller* holding, we are led to the conclusion that the defendant's right to cross-examination is not affected by utilization of this statute, as either he or his attorney must be afforded the opportunity to question the child. IC 35–37–4–8(g)(2); *Miller, supra.* Finally, we would point out that the defendant is entitled to attend the proceedings and witness every aspect thereof, albeit possibly outside of the vision and hearing of the child if represented by an attorney.

IC 35–37–4–8(f)(7). So long as the statute is construed to require that meaningful communication between the defendant and his attorney be established during the child's testimony, that the defendant be given the opportunity to cross-examine the child, and that particularized findings of need for special protection of the child must be entered in accordance with IC 35–37–4–8(d)(1)(C), we cannot conclude that IC 35–37–4–8 is unconstitutional per se under either Article 1, Section 13 of the Indiana Constitution or the Sixth Amendment.

■ We turn to the question of whether Brady's right to confrontation was violated by the manner in which IC 35–37–4–8 was applied in his case. We conclude that it was not.

■ IC 35–37–4–8 imposes upon the State the burden of demonstrating that testifying in open court would be a traumatic experience for the child witness. The record shows that an evidentiary hearing was held on the issue of whether testifying in court would be a traumatic experience for T.B. Abbie Dallek, a child and adolescent therapist who had spent 16 one-hour sessions treating T.B., testified that an open-court examination of T.B. would be extremely traumatic for the child, resulting in increased anxiety and behavior problems. Dallek stated that T.B. had not seen her father in a long time, that she was experiencing conflicting emotions toward him, and that testifying before him would be particularly traumatic in her case due to her heightened sensitivity. Dallek also testified that the examination would be considerably less traumatic for T.B. if it took place in an environment she was comfortable with and in the presence of people she trusted. Detective Battles, who had spoken with T.B. on several occasions, testified that T.B. was most relaxed and willing to discuss the incident with Brady in the bedroom of her own home.

■ Based on the testimony of these two witnesses, the trial court entered its finding that it was more likely than not that requiring T.B. to testify in court would be extremely traumatic for the child, specifically noting Dallek's testimony regarding

T.B.'s state of mind, and her regressive behavior following discussion of the alleged sexual abuse at the hands of her father. (R. 336.) The court further found that questioning the child in the courtroom would be traumatic to the child based on testimony heard, particularly in light of her age; the fact that strangers would be questioning her; and the imposing physical appearance of the courtroom. We conclude that these findings are specific enough to meet the requirements of IC 35–37–4–8 and are supported by the evidence. Brady has not shown error with respect to the trial court's determination.

Brady also argues that his right to confrontation was denied by the means used to videotape T.B.'s testimony. During the videotaping session, Brady was placed in the garage of T.B.'s home and watched the proceedings, which took place in her mother's dining room and bedroom, on a television monitor. He was in constant communication with his attorney during her examination by way of two-way radio. For the purpose of continuity in the proceedings, the attorneys used flash cards to indicate points of objection during T.B.'s examination. After T.B.'s examination was concluded, the attorneys and the trial judge reviewed the videotape and discussed the objections in full.

Brady has not shown this court how the procedures used infringed on his right to confrontation. The record shows that Brady's attorney was afforded an unfettered and unlimited cross-examination opportunity and that communication between Brady and his attorney was not hampered by use of the two-way radio. We conclude that no error has been shown.

■ Finally, Brady alleges that the trial court abused its discretion when it admitted into evidence the videotape of T.B.'s testimony. Brady contends that because the tape was of such poor video quality, the jury was incapable of judging T.B.'s demeanor when assessing her credibility.

The State contends that this issue has been waived because Brady failed to include the videotape in the record before this court. However, pursuant to Indiana Rules of Procedure, Appellate Rule 7.2(C), we ordered the videotape sent to this court so that we might review this issue on the merits. *See, Andrews v. State* (1982), Ind., 441 N.E.2d 194, 200.

The test of the admissibility of a videotaped recording requires that we determine whether the recording taken as a whole, or a crucial segment thereof, is of such poor quality that it is likely to lead the factfinder to speculate as to its contents. *Smith v. State* (1979), 272 Ind. 328, 397 N.E.2d 959, 962, *reh. denied.* After viewing the videotape in question, we disagree with Brady's contention that the quality of the videotape was so poor that it should not have been admitted. Uniform perfection throughout the recording is not required. *Id.* T.B.'s testimony was taped in the bedroom and dining room of her home. The video cameras were positioned in an upper corner of each room, facing down on the participants. Both rooms were well lit and small enough that the activities of all participants were visible. Additionally, T.B. was centered by the camera angles and clearly visible at all times, but for several occasions when she briefly ran from the rooms or buried her head under the covers of her bed. Finally, the audio portion of the tape was clear and intelligent at all times, as evinced by the court reporter's transcription of the same. We conclude that the tape was of sufficient quality for intelligent and unspeculative viewing by the jury.

## II.

### Demonstrative Evidence

■ Brady argues the trial court erroneously permitted the use and admission of anatomically correct dolls. On appeal, his arguments are predicated on several bases and are in reference to several witnesses. However, issues raised without presenting cogent argument or citation to pertinent authority are waived. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7); *Callahan v. State* (1988), Ind., 527 N.E.2d 1133,

1141.[3] As a result, we confine our consideration to the issue of whether the trial court erred in overruling Brady's objection to the use of dolls in the videotaped examination of T.B.

The admissibility of demonstrative evidence hinges on its potential to assist in explaining or illustrating relevant testimony to the trier of fact. *Newton v. State* (1983), Ind.App., 456 N.E.2d 736, 741. It is within the discretion of the trial court to allow a child to use dolls as a testimonial aid, even if the dolls are not anatomically correct. *Cleaveland v. State* (1986), Ind. App., 490 N.E.2d 1140, 1141. A viewing of the videotaped examination shows that T.B. was given "anatomically correct" dolls, one male and one female, to aid her in testifying as to the means by which she acquired her injuries. Brady cryptically argues that the use of dolls in T.B.'s examination was misleading. He does not establish that the use or the features of the dolls misrepresented T.B.'s testimony, misled the jury, or prejudiced him in any way. Further, the videotape shows that attempts to get T.B. to demonstrate with the dolls during the course of her examination were uniformly futile. Any potential error in allowing the use of the dolls was thereby rendered harmless. There is no error.

### III.

#### *Motion for Mistrial*

Brady contends the trial court erred in denying his motion for mistrial tendered during the State's opening statement. The denial of a motion for mistrial is a matter committed to the discretion of the trial court, and is reviewable only for manifest abuse thereof. *Pittman v. State*

(1988), Ind., 528 N.E.2d 67, 72. A defendant is entitled to the remedy of mistrial only where he has been placed in a position of grave peril to which he should not have been subjected. *Willis v. State* (1987), Ind. App., 512 N.E.2d 871, 875, *trans. denied.*

The motion for mistrial here in issue was made in response to the following remarks by the State:

... T.B.'s mother, Carla, and the defendant, were married at the time T.B. was born, but in September of 1983, when T.B. was a little over a year old, Carla filed for divorce and the divorce was granted in November of 1983. Now in this divorce, there was an agreement as to the visitation of T.B. by the father, the defendant and this was done with the custody being awarded to the mother, Carla. This was all by agreement, Ladies and Gentlemen. Over the course of the next few months, the visitation proceeded and there came a problem with the visitation only to the extent that more specific times needed to be agreed upon by the parties which was done and the visitation went from what is called a reasonable visitation to a more specific time and place type of visitation. The visitation problems became more apparent in teh [sic] beginning of the year, 1985, when based upon some complaints by T.B., Carla became concerned about her well being, [and] petitioned the Court to have the visitation terminated.

MR. LUBER: Your Honor, I'm going to object. May we approach the bench?

(R. 384, 385.)

On appeal, Brady contends that the implication raised by the State was that he had

---

**3.** Brady also raises the issues of: whether the trial court erred in overruling Brady's objection to the use of dolls in testimony and in reference to witness interviews; whether the trial court erred in overruling Brady's objection to the admission of dolls with male and female primary sex organs; and whether the trial court erred in overruling Brady's objection to the use of leading questions with the dolls in T.B.'s videotaped examination.. Rather than argue these issues, Brady refers us to the arguments presented on the issue addressed above and to the appendix of his brief, which is a reprint from the record

of numerous objections raised to the videotaped examination of T.B. No specific objections or their bases are brought to our attention, no citations to the record are provided to assist us in discerning the focus of any of these issues, and the issues as stated are too vague for us to glean clear directions for the assignments of error. Further, the portions of the brief to which Brady refers us provide no cogent argument on these issues, nor are there citations to relevant legal authority. These issues are waived. A.R. 8.3(A)(7); *Callahan, supra.*

committed acts of sexual misconduct previous and unrelated to the charges at issue. Evidence of prior misconduct is highly prejudicial and of strictly limited admissibility, Brady continues, the suggestion of which in this instance created a "harpoon" so serious as to require a mistrial. We disagree.

■ Concurrent with its denial of Brady's motion for mistrial, the trial court thoroughly admonished the jury as follows:

> ... I've also told you those opening statements are not evidence, but counsel are entitled to tell you what they think the evidence will be, but of course in the opening statements, they are only telling you what they think some of the evidence is that will come in, so in these opening statements you are not to regard them as evidence or any statements that have been made. You are the judges of the evidence and the inferences from the evidence and so, I caution you that you are not to regard any of these statements as to what evidence may or may not be in this case or what it may or may not infer until you hear that evidence, until you think what the evidence means and what the truth is here, and with that reminder, Mr. Nussbaum, I'm sorry to interrupt you, but please proceed.

(R. 393, 394.) The record also shows that the jury was instructed in instruction number seven that opening statements should be considered only as a preview of what the attorneys expected the evidence to be, and are not evidence upon which to base a verdict. (R. 81.) "Where the trial judge admonishes the jury to disregard what has occurred at trial, or if other reasonable curative measures are taken, the court's denial of a mistrial is not reversible error." *Brendel v. State* (1984), Ind., 460 N.E.2d 919, 921. We conclude that the court's admonishment was sufficient to overcome any potential prejudice to Brady stemming from the State's opening remarks. Thus, there was no abuse of discretion in the trial court's denial of the motion for mistrial.

## IV.

### *Hearsay*

■ Dr. Hanley was questioned by the State concerning an injury T.B. sustained in February of 1986. In the course of this line of questioning, the following exchange occurred:

> Q And what was the explanation the mother provided you in February of 1986?
>
> MR. LUBER: We'll object. That calls for hearsay.
>
> THE COURT: That's overruled. You may answer.
>
> WITNESS: The mother said that the child fell on a chair and hit her crotch.

(R. 460.) Without expanding on his point, Brady contends the trial court should not have permitted Dr. Hanley to answer this question because it called for inadmissible hearsay. This argument is without merit.

The hearsay rule has many exceptions, the most basic of which is that a prior extrajudicial statement is admissible as substantive evidence when the declarant is a witness who testifies and is available for cross-examination. *Wolfe v. State* (1987), Ind., 512 N.E.2d 185, 187. The declarant in this instance, Carla Myers, immediately succeeded Dr. Hanley to the witness stand. It is not required that the declarant testify prior to admission of his hearsay statement provided he is made available for cross-examination at some point during trial. *Stamps v. State* (1987), Ind., 515 N.E.2d 507, 510, *reh. denied.* The trial court did not err in overruling Brady's objection on this point.

## V.

### *Bad Character*

■ Brady contends the trial court erroneously overruled his objection to cross-examination questioning concerning his violation of a visitation order in 1985. Brady asserts the inadmissibility of this evidence on the grounds that bad character may be shown only by general reputation, and not by proof of specific acts. This argument is without merit.

■ A review of the record shows that, prior to taking the stand himself, Brady

offered a parade of witnesses who testified to his good character. When a defendant chooses to offer evidence of his reputation for character, he opens the door for the State to offer evidence of his bad character, which evidence may include specific acts of prior misconduct and past crimes. *Berkley v. State* (1986), Ind., 501 N.E.2d 399; *Eguia v. State* (1984), Ind.App., 468 N.E.2d 559. Additionally, we would point out that a witness may be cross-examined as to all matters within his knowledge which are pertinent to the case, including facts which are inconsistent with the testimony of other witnesses. *Robertson v. State* (1974), 262 Ind. 562, 319 N.E.2d 833, 836. There was no abuse of discretion in the trial court's decision to permit this line of questioning.

## VI.

### *Jury Instructions*

■ Brady next asserts reversible error in the trial court's refusal of tendered instruction number seven regarding circumstantial evidence. This instruction provided:

Evidence may be either direct or circumstantial. Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact that may be logically and reasonably drawn from another fact or group of facts.

It is not necessary that facts be proven by direct evidence. Both direct and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other.

In a case where circumstantial evidence alone is relied on, the circumstances disclosed by the evidence must be of such character and strength as to exclude every reasonable hypothesis except guilt. If the circumstances disclosed can be explained on any reasonable hypothesis except guilt or can be explained on any reasonable theory of defendant's innocence, the defendant is entitled to acquittal. But circumstantial evidence alone may be sufficient to support a verdict of guilty on any crime, provided that the jury believe beyond a reasonable doubt that the accused is guilty as charged.

(R. 101.)

■ As Brady points out, where evidence of guilt is entirely circumstantial, failure to give a tendered instruction on circumstantial evidence is reversible error. *Ball v. State* (1980), Ind.App., 406 N.E.2d 305; *Spears v. State* (1980), 272 Ind. 634, 401 N.E.2d 331. However, the trial court is not required to instruct the jury on circumstantial evidence where both direct and circumstantial evidence of guilt exist. *Armour v. State* (1985), Ind., 479 N.E.2d 1294, 1300. T.B.'s videotaped testimony, in which she testified of her own knowledge of the main facts to be proven, provided the direct evidence needed to overcome the necessity of this instruction.[4]

## VII.

### *Opinion Evidence*

■ The State elicited the following testimony from Dr. Hanley during the redirect portion of her examination:

Q Doctor, you indicated you were not aware or could not remember whether or not the hymen had ruptured?

A I can't remember. Right.

Q Would that factor in as far as your decision in your mind in this particular matter?

A No, it would not.

Q Why not?

A Because even if her hymen were not ruptured, prior to that she could have been sustaining sexual abuse without

---

**4.** T.B.'s testimony included the following assertions of fact: that "Daddy Mike" had hurt her in the bedroom of his home; that she had been hurt between her legs at "Daddy Mike's" house; and that "Daddy Mike" had been present and sitting on the bed when she got hurt between her legs.

having the hymen ruptured from fondling or rubbing and so the fact that I had not observed any rupture of her hymen up to that point wouldn't mean that she had not been experiencing some type or kind of abuse up until then. The time when she was so badly injured in April, I could not see her hymen because that sedative was not enough to allow me to pull her—except her labia minora, so that I could see it on that occasion, and I believe it must have been ruptured on that occasion.

MR. LUBER: Objection.

WITNESS: I couldn't see it.

MR. LUBER: That's a conclusion not based upon the evidence.

(R. 482, 483.)

On appeal, Brady contends this testimony was speculative and involved mere possibility, thereby rendering it inadmissible. As regulation of the scope and extent of redirect examination is left to the sound discretion of the trial court, we review only for abuse of discretion. *May v. State* (1986), Ind., 502 N.E.2d 96, 102. We are unable to conclude that the trial court abused its discretion in allowing Dr. Hanley's opinion evidence on this matter.

■ We first point out that the subject of whether T.B.'s hymen was ruptured was first raised in Brady's cross-examination of Dr. Hanley. A subject raised on cross-examination is available for pursuit by the opposing party when redirecting the witness. *Kalady v. State* (1984), Ind., 462 N.E.2d 1299, 1309.

In addressing Brady's concern over the speculative nature of Dr. Hanley's testimony on this issue, it is appropriate to point out that medical testimony is often phrased in terms of probabilities and inferences. *Hughes v. State* (1987), Ind.App., 508 N.E.2d 1289, 1298, *trans. denied.* While the extent of T.B.'s injuries could not be conclusively established on examination because of her emotional state, Dr. Hanley's testimony was based upon her observation, examination and treatment of T.B. As evinced by the testimony quoted above, the jury was well aware that Dr. Hanley was offering an opinion on the subject. Brady does not contest Dr. Hanley's qualifications to express an opinion on this matter. Brady's argument goes to the weight to be given this evidence; not to its admissibility. *Id.*

### VIII.

### *Child Abuse Symptoms*

Brady next argues that the trial court erred in disregarding its ruling on a motion in limine and allowing Abbie Dallek to testify as an expert regarding the effects of sexual abuse on pre-school age children.[5] Specifically, Brady contends that "child abuse accommodation syndrome" is not a recognized field of expertise and that, even if such a field does exist, Dallek was not qualified to testify as an expert in it. In the instant case, Dallek testified that T.B. exhibited behavioral characteristics consistent with those commonly observed in sexually abused children.

■ Dallek testified that she is a child and adolescent therapist with a Master's Degree in Social Work from Indiana University. She completed an 18–month family therapy program at the Family Learning Center in South Bend and worked at Riley Children's Hospital for a time, following which she was certified as a family therapist by the National Academy of Family Therapists. Dallek also worked for five years at the Madison Center in South Bend as a member of its child and adolescent therapy team, during which her patients included sexually molested pre-schoolers. In 1985, Dallek went into private practice specializing in therapy with teenagers and children. Dallek testified that, in her seven years of work in South Bend, she had worked with approximately 50 children and 200 adolescents who had been sexually abused. In addition to her personal experi-

---

**5.** The State correctly points out that, while the trial court granted Brady's motion in limine seeking to exclude testimony on child abuse accommodation syndrome for the purposes of voir dire and opening statements, it reserved its decision on the ultimate admissibility of such testimony for consideration in the context of trial. (R. 65, 410.)

ence with sexually abused children, Dallek attended workshops which focused on work with sexually abused children and sex offenders.

"An expert witness is one who, by reason of education or special experience, has knowledge respecting a subject matter about which persons having no particular training are incapable of forming an accurate opinion or making a correct deduction." *Wade v. State* (1986), Ind., 490 N.E. 2d 1097, 1104. The question of whether a witness is qualified to testify as an expert is a matter within the discretion of the trial court and its determination is reversible only for an abuse thereof. *Hatcher v. State* (1987), Ind.App., 510 N.E.2d 184, 187.

■ Brady bases his allegation of incompetency on Dallek's unfamiliarity with the term "child abuse accommodation syndrome" and her admission that she had not had a training class in the treatment of sexually abused children. However, practical experience is as valid a means of qualifying one as an expert as formal training. *Willis, supra,* at 876. The extent of Dallek's familiarity with the term "child abuse accommodation syndrome" does not determine her competency as an expert, but rather goes to the weight to be given to her testimony by the jury. *Id.,* at 876. Dallek's experience and education in the field of family therapy, particularly her many professional encounters with sexually abused children, provided the trial court with sufficient evidence to determine that Dallek was qualified to testify as to the effects of sexual abuse on children.

■ Brady further contends that the study of the effects of sexual abuse on children, i.e., the "child abuse accommodation syndrome," is not a recognized field of expertise and therefore not properly the subject of expert testimony. It is not clear on what authority Brady bases this conclusion, but inarguably, it is erroneous. In the recent case of *Hatcher, supra,* at 187, we upheld a trial court's decision to allow expert testimony by a family therapist regarding the effects of sexual abuse on the victims of that abuse. We have also stated: "It is permissible in child molesting cases to question an expert witness regarding objective indications that the child might be fabricating the story *or objective observations of the child's behavior which would lend credence to the child's testimony." Douglas v. State* (1985), Ind.App., 484 N.E.2d 610, 612. (Our emphasis.) Dallek's testimony was used to show the consistency between T.B.'s post-molestation behavior and the professionally recognized behavioral tendencies of sexually abused children, thus assisting the jury in its search for truth. *See Fox v. State* (1987), Ind., 506 N.E.2d 1090, 1095.

We agree with the State that the trial court did not abuse its discretion in adjudging the area of symptoms of sexual abuse in children to be beyond the knowledge of the average lay person. Too, the trial court was presented with sufficient evidence by which to determine that Dallek had the education and experience to qualify as an expert witness on symptoms of child sexual abuse. Thus, we conclude there was no abuse of discretion in allowing Dallek to testify.

## IX.

### Bias

■ Brady's next contention is that the trial court erroneously restricted cross-examination of State's witness Mark Myers on the subject of whether he was having an affair with Carla Myers prior to her divorce from Brady. Brady contends he was entitled to cross-examine on this subject in order to show bias on the part of the witness. If a subject has a reasonable degree of probability that it will show bias for or against a party, it is a legitimate basis for cross-examination. *Peterson v. State* (1987), Ind., 514 N.E.2d 265, 271.

■ It is the burden of the questioning party to demonstrate that a reasonable degree of probability exists that the witness is biased because of the evidence sought to be included. *Harrington v. State* (1980), Ind.App., 413 N.E.2d 622, 626, *trans. denied.* Limitation of the extent of cross-examination is within the discretion of the

trial court. *Fassoth v. State* (1988), Ind., 525 N.E.2d 318, 322.

Brady contends the State opened the door to this evidence by eliciting Myers' testimony that it was he who suggested that T.B. attend a birthday party with Brady at T.B.'s therapist's office, thereby attempting to establish his lack of bias. We are not given the basis of the trial court's restriction of this testimony. However, as stated in *Harrington, supra,* a sexual relationship does not per se give rise to bias. In this case, Brady failed to demonstrate to this court or the trial court that a reasonable probability existed that Myers' alleged affair with Carla created a bias on his part against Brady. As a result, we cannot conclude that the trial court abused its discretion in restricting this line of cross-examination.

## X.

### Sufficiency

Brady next argues that the evidence presented at trial was insufficient to support his conviction and that the verdict is therefore contrary to law. Specifically, Brady claims there was no unequivocal evidence establishing that he or anyone else touched his child in the manner charged, and in support of this argument points out the contradictory nature of T.B.'s video-taped testimony concerning the source of her injuries. A reviewing court determining whether sufficient evidence exists to support a verdict considers only evidence most favorable to the verdict and all reasonable inferences to be drawn therefrom. The evidence is not reweighed nor is the credibility of witnesses judged. The conclusion of the trier of fact will remain undisturbed when supported by substantial evidence of probative value. *Smith v. State* (1988), Ind., 531 N.E.2d 1162, 1163.

In order to meet its burden in this case, the State must prove beyond a reasonable doubt that Brady, with a child under the age of twelve, performed or submitted to fondling or touching, either of the child or himself, with the intent to arouse or satisfy the sexual desires of either the child or himself. I.C. 35–42–4–3(b). Our previous

discussion of the facts of this case makes apparent that there was ample evidence to sustain the jury's verdict in this case.

Brady's argument of insufficient evidence is based on statements T.B. made at the conclusion of her videotaped examination to the effect that her injuries resulted from falling off of her bed. However, prior to that equivocation by T.B., she repeatedly identified Brady as the person who had caused her injuries. The jury was fully aware of the inconsistencies in T.B.'s recounts of the source of her injuries, witnessed the context in which she recanted her prior statements, and was fully capable of judging her credibility accordingly. The jury could have reasonably drawn the conclusion that T.B. made up a story to put an end to the embarrassing ordeal of discussing sexual matters before a group of unfamiliar people. We cannot substitute our judgment for that of the jury. *Williams v. State* (1983), Ind., 455 N.E.2d 299, 302.

Brady's conviction was not based solely on the testimony of T.B. A wealth of corroborative circumstantial evidence was presented by the State to bolster its case against Brady. In addition to the testimonies of Dallek, Battles, and Brook, Dr. Hanley testified that T.B.'s extensive injuries were consistent with sexual abuse, and were known to be caused by nothing other than entry of the vagina by a penis or an object. T.B.'s mother and stepfather testified that she was physically and behaviorally normal prior to the Saturday evening spent with Brady, shortly following which her injuries were discovered. Finally, with respect to whether sufficient evidence of intent exists, the intent to gratify or arouse sexual desires may be inferred from evidence of Brady's intentional touching of T.B.'s genital area. *See Hammond v. State* (1985), Ind.App., 479 N.E.2d 629, 632.

There is substantial evidence of probative value to sustain the verdict of the jury.

## XI.

### Sentencing

Lastly, Brady contends the imposition of a seven year prison sentence by the

trial court was unjustifiably harsh and vindictive, basing his contention solely on the face that the trial court indicated that the sentence was enhanced so as not to depreciate the seriousness of the crime. We find no merit to this argument.

▮▮▮ The decision of whether to increase or decrease a sentence because of aggravating or mitigating circumstances rests in the discretion of the trial court. We are precluded from disturbing a sentence within the strictures of a sentencing statute unless the sentence is manifestly unreasonable in light of the offense and character of the offender. *Walker v. State* (1988), Ind., 527 N.E.2d 706, 711. When a trial court departs from a presumptive sentence, it must specify all significant aggravating and mitigating circumstances and set forth specific facts and reasons supporting the existence of the circumstances found. *Kail v. State* (1988), Ind.App., 528 N.E.2d 799, 810, *trans. pending.* Brady was convicted of a class C felony, which has a statutory sentencing range of two to eight years imprisonment and a presumptive sentence of five years. I.C. 35–50–2–6. The trial court in this case set forth numerous aggravating and mitigating circumstances which weighed in its final determination to enhance Brady's sentence. Among the aggravating circumstances enumerated were: Brady's need for correctional treatment; the young age of the victim; and the physical and psychological injury to the victim. An enhanced sentence may rest upon only one valid aggravating factor. *Kelly v. State* (1988), Ind.App., 527 N.E.2d 1148, 1156, *trans. pending.* Further, the record supports these findings by the trial court. In light of the offense and the relationship of the offender, we cannot find the sentence manifestly unreasonable.[6]

Affirmed.

CONOVER, P.J., concurs.

HOFFMAN, J., dissents with separate opinion.

HOFFMAN, Judge, dissenting.

I respectfully dissent from the majority's disposition of the first appellate contention raised by Brady: whether IND.CODE § 35–37–4–8 (1988 Ed.) and the procedures used to videotape the testimony of the child witness, T.B., violated Brady's right to confront his accusers.

IND.CODE § 35–37–4–8 provides in pertinent part:

"(f) If the court makes an order under subsection (c), only the following persons may be in the same room as the child during the child's videotaped testimony:

\*  \*  \*  \*  \*  \*

(3) The defendant's attorney (or the defendant, if the defendant is not represented by an attorney).

\*  \*  \*  \*  \*  \*

(7) The defendant, who can observe and hear the testimony of the child without the child being able to observe or hear the defendant. However, if the defendant is not represented by an attorney, the defendant may question the child."

In the instant case, Brady was represented by an attorney who attended the videotaping session during which T.B.'s testimony was elicited. Pursuant to IND.CODE § 35–37–4–8(f)(7), Brady was placed in the garage of T.B.'s home and watched the proceedings on a television monitor.

IND.CODE § 35–37–4–8(f) is unconstitutional, as it violates Article I, § 13 of the Indiana Constitution. Article I, § 13 provides criminal defendants in this State with a right of confrontation independent of the right to confront granted by the Sixth Amendment of the federal constitution. Article I, § 13 states: "In all criminal prosecutions, the accused shall have the right ... to meet the witnesses face to face...."

There is no ambiguity in the constitutional provision. "Face to face" confrontation must surely mean "face to face" confrontation. The right granted by Article I, § 13 is violated when a defendant is placed at a

---

**6.** Brady's assignments of error numbered 13, 14, 15, 17, 21, 23, 24 and 25 are waived for failure to present cogent argument or cite relevant legal authority. A.R. 8.3(A)(7); *Pasha v. State* (1988), Ind., 524 N.E.2d 310, 314.

location where he or she cannot be seen or heard by the witness, even though the defendant is permitted to observe the witness and listen to the witness's testimony.

The majority suggests that the right of confrontation is adequately protected so long as there is an opportunity to cross-examine the child witness. *Miller v. State* (1987), Ind., 517 N.E.2d 64, is cited in support of that proposition. The Supreme Court in *Miller* did not hold that cross-examination fully satisfies the constitutional mandate found in Article I, § 13; rather, the Court held that Article I, § 13 *includes* the right to cross-examine. *Id.* at 69. The right to meet witnesses face to face is in no way undermined by the *Miller* decision.

For the foregoing reasons, I dissent.